# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF ALABAMA

In re                                    Case No. 10-30631-WRS
                                         Chapter 7
ALLEGRO LAW LLC,

     Debtor

## MEMORANDUM DECISION

     These related cases came before the Court on June 15, 2010, upon three applications for compensation of professionals. First, Troy Ted Tindal, counsel for Keith A. Nelms, filed a "Motion to Approve Payment of Legal Fees From Debtor's Funds." (Case No. 10-30430, Doc. 40). Second, Louis C. Colley, the Receiver appointed in State Court proceedings which predated the filing of these bankruptcy cases, filed an "Application of Receiver for Compensation to be Paid as an Administrative Claim." (Case No. 10-30631, Doc. 73). Third, Louis Colley filed a "Motion for Allowance of an Administrative Expense Claim," seeking payment in the amount of $399,820.23 for the fees of AmeriCorp, Inc., and Seton Corp., who provided administrative services in the debt management business which had been taken over by the Receiver. For the reasons set forth below, the application of Troy Ted Tindal as counsel for Keith A. Nelms is denied. The application of Receiver Louis C. Colley, and his lawyers and accountant, is deferred. In addition, the application to pay Americorp and Seton Corp., is also deferred. The Court will discuss the history of these proceedings and explain its approach to the resolution of these Chapter 7 cases.

## I. Proceedings Prior to the Bankruptcy Filings

Keith A. Nelms is an individual who formerly practiced law in Prattville, Alabama.[1] In 2008, Nelms created Allegro Law, LLC and Allegro Financial Services, LLC. Acting through these limited liability companies, Nelms did business as a debt management and a debt settlement firm. Such business purport to act on behalf of their customers and satisfy their debts, sometimes by paying less that the amount owed. Nelms would draft his clients' bank accounts regularly and pay himself a fee out of the money collected. Nelms solicited individual consumers, ultimately signing up approximately 15,000 individuals. Virtually all of the actual administrative work was outsourced to AmeriCorp and Seton Corp., which are in the business of providing these kinds of services. Americorp is not a law firm and does not purport to practice law. The manner in which Nelms did business created at least 4 structural probelems.

The first structural problem with the way Nelms did business is that Americorp was doing virtually all of the work, but it was not a law firm and it did not use lawyers to provide services pursuant to its agreement with Nelms and the Allegro companies. Nelms, on the other hand, was a lawyer, but wasn't doing much of anything that resembled real legal work. To put the matter plainly, Nelms was "fronting" his law license for Americorp. When one considers the math here,

---

[1] These facts are taken from an Order Granting a Permanent Injunction dated February 11, 2010, in proceedings styled <u>The State of Alabama and The Alabama Securities Commission v. Allegro Law, LLC, Allegro Financial Services, LLC, and Keith Anderson Nelms</u>, Civil No. CV-09-125-F, in the Circuit Court for Autauga County, Alabama. A copy of this Order is attached as Exhibit 1 to the "Motion for Emergency Relief in the Form of Being Excused From the Automatic Stay and/or Other Alternative Relief," filed by Receiver Louis Colley. (Case No. 10-30631, Doc. 8). In addition, the Trustee submitted a copy of the Circuit Court's "Order Granting Preliminary Injunction and Appointing Receiver," dated July 9, 2009, as Exhibit 6 at the hearing on the Receiver's Motion which was heard by the Bankruptcy Court on March 29, 2010.

it is easy to see the problem. If we consider 15,000 individual consumers and assume for the sake of rough analysis, 5 creditors per individual debtor, we see that Nelms would have had to negotiate 75,000 contracts. Hence, Americorp attempts to fill the gap using Nelms and his law license in name only. In fact, Nelms was deceiving his clients and Americorp was practicing law without a license. Nelms represented to his clients that he was acting as their lawyer and his written contracts with them were styled retainer agreements.[2]

The second problem arises in the payment of fees to Nelms and Americorp. Before any money was paid to creditors, Nelms paid himself and Americorp. As Nelms' clients are not in bankruptcy and do not have the benefit of the automatic stay, there was no legal right not to pay the creditors. The Circuit Court found that Nelms had deceived his clients regarding the payment of both his fees and the payment of his clients' debts.

A third problem arises in that Nelms collected millions of dollars from clients, not all of which was to be paid for his "front loaded" fees, but rather at least some of which should have been paid to creditors. The Circuit Court found that Nelms and his codefendants "illicitly diverted some of this money to themselves and their families and other businesses." Order, p. 14.

A fourth problem arises from Nelms' dealings with the creditors of his clients. For example, Nelms sent 2,344 identical letters to Chase Bank on behalf of his clients, purporting to dispute the validity of their debts. This was not done in a good faith effort to properly adjust the amount of their debts, but rather to buy time so that Nelms could collect his fees from payments

---

[2] Copies of several of these "Retainer Agreements" were offered into evidence at the March 29, 2010 hearing by the Trustee as Exhibit 17.

made by clients while temporarily holding creditors off with frivolous disputes as to the amounts owed. In other words, Nelms was taking money for himself which was intended by his clients to be paid to Chase and other creditors. The Circuit Court found that only 58 of 5,453 Chase accounts were settled for less than the full amount of the debt, and that of these 58, 30 were settled directly by the consumers, without any input from Nelms or Allegro. Order, pp 5, 8.[3]

It did not take long for the activities of Nelms to come to the attention of the Alabama Securities Commission. In the State of Alabama, when one does business whereby one collects money from a customer and then pays his bills, a license is required. This activity is governed by the "Alabama Sale of Checks Act." Ala. Code § 8-7-1, et. seq. Nelms was operating his business in violation of the Act and the Commission was investigating. On April 2, 2009, Nelms met with members of the Commission who explained to him the necessity of a license. On June 9, 2009, more than two months after he had been informed of the requirement of a license, Nelms finally submitted application for a license on behalf of Allegro Financial, LLC. The Commission found that Nelms had falsified the application and denied him a license. Order, p. 6. Nevertheless, Nelms continued to illegally operate his business in violation of Alabama statues until the Commission obtained an Injunction from the Circuit Court for Autauga County.

The State of Alabama and the Alabama Securities Commission brought suit against Nelms, Allegro Law, and Allegro Financial on June 30, 2009, in the Circuit Court for Autauga County, Alabama. The Circuit Court heard evidence and entered a preliminary injunction on

---

[3] More recently, Chase Bank has brought suit in this Court against Nelms, seeking a determination that Nelms liability to it should be excepted from his discharge alleging fraud. See, Chase Bank v. Nelms, Adversary Proceeding 10-3042. The allegations made by Chase in its Complaint appear to be consistent with the finding of the Circuit Court.

-4-

Case 10-30631    Doc 105    Filed 07/06/10    Entered 07/06/10 15:42:07    Desc Main
Document      Page 4 of 16

July 10, 2009. The July 10 Order froze all of the assets of Allegro Law and Allegro Financial and installed Louis Colley as a Receiver. From July 10, 2009 forward, Nelms was ousted from any control over these business and their assets. Under the Receivership of Colley, no new customers were accepted; however, Colley attempted to serve the existing Allegro customers. The Circuit Court made lengthy findings of fact and conclusions of law. In summary, Nelms was found to have committed numerous violations of the Alabama Sale of Checks Act and the Alabama Deceptive Trade Practices Act, which prohibits "engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." See, Ala. Code § 8-19-7(5).

The Circuit Court further found that:

> The Defendants have induced thousands of customers to become clients of Defendants' unlicensed debt payment business by advertising that leads customers to believe that Defendants are licensed and conducting business in compliance with Alabama laws.
>
> Unsuspecting consumers have paid millions to Defendants for payment of credit card debt. Defendants are illicitly diverting some of this money to themselves and their families and other businesses. Continued irreparable harm will result to consumer without the requested relief because Defendants have already transferred funds to individuals who are not creditors of consumers. The Plaintiffs have established that the continued unlicensed and unregulated activities of Defendants cause irreparable injury to their customers.

Order, p. 14.

Nelms' activities did not escape notice from the Alabama Bar. After an investigation was undertaken, Nelms pleaded guilty to numerous ethical violations arising out of his activities in

-5-

the debt settlement and debt management business and has been suspended from the practice of law for a period of three years. See, In re Keith Anderson Nelms, ASB Nos. 08-247(A); 09-1481(A); and CSP 09-1684(A), Alabama Supreme Court Order dated July 9, 2009.

By mid 2009, Nelms had been suspended by the Bar for three years for unethical conduct and had been stripped of most of his assets by the Autauga County Circuit Court. Nelms had been found to have perpetrated a massive fraud on 15,000 clients, to have falsified an application to the Alabama Securities Commission and operated a debt management and debt settlement business without having obtained the necessary licenses.

## II. The Bankruptcy Proceedings

### A. The Receiver's Motion

On February 22, 2010, Nelms filed a voluntary petition in bankruptcy pursuant to Chapter 7 of the Bankruptcy Code, initiating case no. 10-30430. Daniel Hamm was appointed Trustee in the Nelms bankruptcy. When he learned of the debt management scams perpetrated by Nelms, Hamm filed petitions in bankruptcy on behalf of Allegro Financial Services, LLC and Allegro Law, LLC, initiating case numbers 10-30630 and 10-30631 respectively. Hamm serves as Trustee in all three Chapter 7 cases.

Shortly after his appointment in the Allegro cases, Hamm contacted Louis Colley, the Receiver appointed by the Circuit Court, and requested that he turn over the funds and records held by him. In response, Colley filed a motion with this Court to excuse the Receiver's

-6-

Case 10-30631   Doc 105   Filed 07/06/10   Entered 07/06/10 15:42:07   Desc Main
Document      Page 6 of 16

compliance with 11 U.S.C. § 543(a) and (b), pursuant to § 543(d).[4]  See, (Case No. 10-30631, Doc. 8).  While Colley's filing is lengthy, the gist of it is that Colley was of the view that the customers of Allegro Law would be best served by the continued operation of the Receivership

---

[4]  11 U.S.C. § 543 provides, in part, as follows:

> (a) A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.
>
> (b) A custodian shall–
>
>   (1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and
>
>   (2) file an accounting of any property of the debtor, or proceeds, product, offspring rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.
>
> * * *
>
> (d) After notice and hearing, the bankruptcy court–
>
>   (1) may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property.

as contemplated by the Order handed down by the Circuit Court, rather than a Chapter 7 liquidation. Hamm objected to Colley's motion (Case No. 10-30631, Doc. 12).

This Court conducted an evidentiary hearing on the Receiver's motion on March 29, 2010. Hours of oral testimony was heard and hundreds of pages of documents were offered into evidence, both by Receiver Colley and Trustee Hamm. (See generally, Trustee's Exhibits 1-42, inclusive and Receiver's Exhibits 1-11, inclusive). Receiver Colley proposed to operate the Receivership on a "permanent" basis, that is until the debt management plans in place by the 15,000 consumers were completed. Trustee Hamm on the other hand proposed to liquidate the assets, most of which are cash, and make a distribution to creditors, as provided by Chapter 7 of the Bankruptcy Code.

At the conclusion of the March 29 hearing, the Court denied the Receiver's motion and ordered that the property and records be turned over by Colley to Chapter 7 Trustee Daniel Hamm. (Case No. 10-30631, Doc. 26). The Court had several concerns with the continued operation of the businesses by the Receiver. The theory advanced by Colley was that he would be able to get the Allegro customers the benefit of their bargain, or at least better achieve that end than would a Chapter 7 Trustee by way of liquidation. To evaluate the Receiver's contention, one should first review the retainer agreements.

A copy of a contract between Allegro Law and one of its clients was offered into evidence at Exhibit 17 and is styled a "Retainer Agreement." Paragraph 1 of the Agreement provides in part that:

> Attorneys agree to review certain agreements that Client has
> entered into with one or more credit card issuing banks. Upon

> completion of this review, Attorneys will independently decide whether Client would be eligible to be entered into a structured settlement agreement with the above referenced credit card issuing banks, or a lump sum settlement with the above referenced credit card issuing banks (the "Debt Management Plan" or "Program"). If Attorneys determine that it is in Client's best economic interest to enter into the Program, Attorneys shall use their best efforts to negotiate a Debt Management Plan for Client. Client authorizes Attorneys to contact Client's specified creditors for purposes of obtaining new payment terms, to collect information from such creditors, to arrange for payment in installments to such creditors and to monitor Client's enrolled accounts.
>
> * * *
>
> Attorneys have contracted with certain agencies to perform certain budget analysis and administrative functions including handling the delivery and receipt of all written documentation relating to the Retainer Agreement. Legal services that are performed under the terms of the Retainer Agreement are generally performed by the Attorneys.

While the contract discloses that budget analysis and administrative functions would be performed by a separate agency, the tenor of the contract is that analysis and negotiation would be done by Allegro lawyers. The Circuit Court found that lawyers were not performing these functions and as a result, the Receivership was put in place. This was one of the reasons that the Alabama Bar brought a disciplinary proceeding against Nelms. Nelms was entering into contracts to represent clients, taking their money, but not providing the services which he promised to provide.

The Receiver's goal of trying to get the Allegro clients the benefit of their bargain is laudable enough. The problem is that it cannot be done with the resources available. Colley testified at the March 29 hearing and admitted that the 15,000 or so consumers were not his

Case 10-30631    Doc 105    Filed 07/06/10    Entered 07/06/10 15:42:07    Desc Main
Document      Page 9 of 16

clients. Colley's Receivership had assumed responsibility for the 15,000 clients and the contracts for professional representation, however, the Receiver had no plan to provide these services. To be sure, administrative services were still being provided by AmeriCorp, but the clients had bargained for an attorney, and one was not provided, either when Nelms was in control or later when the Receiver was in place.

The Court heard testimony from Colley and his accountant, John M. Finley, at the March 29, 2010 hearing. Having heard this testimony, it is not at all clear what Colley and Finley contributed to this enterprise. During the period of the Receivership, Colley billed and was paid more than $170,000. (Trustee's Exhibit 20). During the same period, Finley and his firm billed more than $150,000. (Trustee's Exhibits 21-24). What was particularly disturbing about all of this is that neither Colley nor Finley had a list of the names and addresses of the 15,000 customers. The Bankruptcy Rules require the Court to give notice to all parties in interest and the only way that names and addresses could be obtained was by way of Americorp, who voluntarily provided the addresses. Indeed, neither Colley nor Finley had a record of the names or addresses of the people they were purporting to serve.

After the filing of the Allegro bankruptcy cases, the Court was deluged with telephone calls and letters from Allegro customers demanding information. The level of anger and frustration shown by the Allegro customers is unprecedented in the history of this Court. The Clerk of Court has received more than 1,000 telephone calls and letters from Allegro customers, complaining that they have been cheated by Nelms. Excerpts from two letters are as follows:

> Your company has over five thousand dollars of my money which
> was taken out of my bank account each month from my only
> income of social security. Now what are people like me to do. I

called your company but there was no one there to speak with which is not right at all. I want all my money back including the $1,000.00 you charged me for nothing. Not one of my creditors have been paid. I can not start over again by paying someone another fee. The money you took from me will help me get back on the road in paying off my debt.

Please send this money to me. I am an inch from ending it all. Your company has made my life unlivable *[sic]*.

Another filing from a man in Tuscaloosa, Alabama states, in part, as follows:

Mr. Nelms and the Allegro Law Firm neglected to provide their advertised service to yours truly. Because of this negligence, I currently have a judgment against me and two wage garnishments ($5,105.61 and $8,331.29) against my Regions bank account for $13,436.90 from my creditors. When I enrolled into Allegro's debt program, I was told by Allegro that my creditors would be notified in order to eventually discuss a possible settlement with them. From October 2008 to May of 2009, I have faithfully paid a monthly fee of $222.00 in addition to a fee of $247.00 for the first month of my enrollment. Once I was informed that my creditors got a judgment against me for my debt of $13,436.90, I immediately discontinued Allegro's debt program.

The calls and filings from Allegro customers are consistent with the findings of the Circuit Court in Autauga County and with the decision of the Alabama Supreme Court in Nelms' disciplinary proceeding. Nelms deceived his clients, took their money, failed to provide the promised services, and diverted client funds to his own uses, leaving them all much worse off than they had been previously.

-11-

## B. Nelms' Motion to Pay His Lawyer

Nelms has been represented in his bankruptcy proceeding by Troy Tindal. Tindal filed a Disclosure of his fee agreement with Nelms at the time he filed the petition in bankruptcy. (Case No. 10-30430, Doc. 1). Tindall agreed to accept $5,000, none of which was paid at the time the petition was filed. A lawyer who files a petition pursuant to Chapter 7 for a debtor is immediately confronted with a problem if he had not been paid, at least for prepetition services, prior to the bankruptcy filing. There is nothing in the Bankruptcy Code which prevents the discharge of the lawyer's fee. Moreover, the debtor's attorney fee is not entitled to priority. See, In re Shell, 312 B.R. 431 (Bankr. M.D. Ala. 2004); see also, 11 U.S.C. § 507.

Notwithstanding these difficulties, Tindal filed a motion with the Court seeking payment of his $5,000 attorney fee out of funds held by the Trustee in the Allegro Law bankruptcy case. (Case No. 10-30430, Doc. 40). To begin with, there is no basis under the Bankruptcy Code for payment of a lawyer's fee out of property of the estate, in a case under Chapter 7, except as a general unsecured claim. In addition, Tindal seeks payment for his services to Nelms out of the money held in the Allegro Law case, disregarding the corporate entity, which Nelms himself so carefully interposed between himself and the creditors of Allegro Law.

The Chapter 7 Trustee objected to Tindal's motion, citing Lamie v. United States Trustee, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed2d 1024 (2004). In Lamie, the Court held that:

> Adhering to conventional doctrines of statutory interpretation, we hold that § 330(a)(1) does not authorize compensation awards to debtors' attorneys from estate funds, unless they are employed as authorized by § 327. If the attorney is to be paid from estate funds

-12-

> under § 330(a)(1) in a Chapter 7 case, he must be employed by the trustee and approved by the court.

Id. at 540 U.S. 538, 124 S.Ct. 1032.  As Tindal was not employed pursuant to 11 U.S.C. § 327, he may not be paid out of estate funds.  Tindal appeared at a hearing on June 15, 2010, making an equitable argument that had the funds not been seized, Nelms could have used funds of Allegro Law to pay his fee, contending that Nelms was owed money by Allegro.[5]  Given that the funds in question were seized by an Order of the Circuit Court of Autauga County, upon findings that Nelms had defrauded thousands of clients, violated the Alabama Deceptive Trade Practices Act, violated the Alabama Sale of Checks Act, and had his law license suspended for three years by the Alabama Bar, all for dishonest and unethical conduct arising out of the debt management business, it is difficult to imagine a less sympathetic debtor or debtor's lawyer.

Given the strictures of the Bankruptcy Code and the decision of the United States Supreme Court in Lamie, which is squarely on point, it is doubtful that under any set of facts, no matter how sympathetic, a bankruptcy court could authorize payment of fees to a debtor's lawyer in a case under Chapter 7.  However, the Court will not hold that, in an extraordinary case, it may be appropriate to pay a debtor's lawyer from property of the estate.  This is not such a case.  In his motion Tindal ignores the reasons given by the Circuit Court for the seizure of Nelms funds, suggesting rather that he and his client have suffered an injustice which could only be righted by the payment of his fees.   Given the history of this case, the motion to pay Nelms' attorney's fees

---

[5] A more likely scenario would have been that the transfer from Allegro Law to Nelms to Tindal would have been a fraudulent conveyance in that Nelms had already taken more from Allegro Law than was owed and that the payment of Tindal's fees would have been a fraud on the creditors of Allegro Law.

-13-

is not only frivolous, but outrageous.  Tindal's motion has been denied by way of a separate document.  (Case No. 10-30430, Doc. 62).

### C. The Receiver's Motions to Pay Professional Fees

The Receiver has filed two separate motions seeking payment of fees for himself, his accountant and Americorp.  In the first of the two motions, the Receiver seeks payment of fees for himself, his accountant and his lawyer.  (Case No. 10-30631, Doc. 73).  The Receiver seeks payment of $23,407.00 for his own fees, $17,837.00 for his accountant, and $27,320.00 for his lawyer.  In his second motion, the Receiver seeks $399,820.23 for his processors Americorp, Seton Corp and The Achievable.  (Case No. 10-30631, Doc. 74).  The Receiver seeks payment pursuant to 11 U.S.C. § 543 (c)(2), which provides that: "the court, after notice and a hearing, shall– . . . (2) provide for the payment of reasonable compensation for services rendered and costs and expenses incurred by such custodian."

The Receiver's motion was scheduled for hearing on June 15, 2010.  The Trustee, noting that the applications had more than 600 pages of attachments, requested additional time for review.  While the Trustee's request is reasonable, and on its face sufficient to continue these proceedings, the Court will take this opportunity to express several concerns.

To begin with, the Court would note that some amount is probably due on the applications.  The business activities were undertaken and funds were accumulated.  However, the question here is whether the amounts requested are reasonable.  The Court further notes that Proof of Claim forms have not yet been mailed to the 15,000 or so individual clients and that no

Case 10-30631    Doc 105    Filed 07/06/10    Entered 07/06/10 15:42:07    Desc Main
Document      Page 14 of 16

determination has been made as to priority. The Receiver's motion is predicated on the understanding that his claims are entitled to an administrative priority and that the claims of the clients are general unsecured claims without priority. This determination remains to be made.

The Court's second concern is as to the value of the services rendered. The Court will require evidence as to precisely what was done and who did what prior to any fees being awarded. Also of considerable interest is the overall disposition of funds flowing through the Allegro accounts. The following questions remain to be answered:

1. How much money was taken from Allegro clients?
2. How much of that money was taken by Nelms?
3. How much was paid to AmeriCorp, Seton and other third parties?
4. How much was paid to creditors of the Allegro clients?

The Court has made inquiry from the Trustee as to whether the amounts owed to the 15,000 Allegro clients can be determined. To date, no accounting has been provided, or shown to exist, which would enable the Court to determine how much is owed. Until this is made clear, the Court will not approve administrative claims in payment of fees to those who were in control of the money and who should be able to answer these questions.

### D. Future Proceedings

The Court set a claims bar date in Allegro Law for October 21, 2010. (Case No. 10-30631, Doc. 71). Due to problems determining the names and addresses of the Allegro clients,

and the amounts owed to them, the mailing of Proof of Claim Forms has been delayed. The Court has been assured that this will happen soon. In addition, the Court will consider extending the claims bar date if the difficulties in learning the identity and address of creditors are not quickly resolved. The Court expects that 10,000 or more claims may be filed in the Allegro Law bankruptcy. After the claims bar date, the Trustee will begin the laborious process of sorting through the claims and filing objections where necessary. At this point, it cannot be determined when a distribution will be made.

### III.  CONCLUSION

For the reasons set forth above, the application to pay Nelms attorney's fees is DENIED. The applications to pay the Receiver and other professionals is DEFERRED.

Done this 6th day of July, 2010.

/s/ William R. Sawyer
United States Bankruptcy Judge

c: Daniel G. Hamm, Trustee
   Troy Ted Tindal, Attorney for Keith A. Nelms
   Teresa R. Jacobs, Bankruptcy Administrator
   George W. Thomas, Attorney for Louis Colley, Receiver
   Keith A. Nelms
   Jackson & Thornton CPA